UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Matthew C. Blair,                                    )<br>                                                          )<br>        Plaintiff,                                    )<br>                                                          )<br>v.                                                        )<br>                                                          )<br>ECI Services of New Hampshire, Inc. d/b/a  )<br>Bennett Funeral Home                          )<br>                                                          ) | Case No. _____ |

**COMPLAINT**
**JURY TRIAL DEMANDED**

**Parties**

1.      The Plaintiff, Matthew C. Blair, resides at 2 Depot Street, Weare, NH  03281.

2.      The Defendant, ECI Services of New Hampshire, Inc. d/b/a Bennett Funeral

Home ("ECI"), is a foreign profit corporation registered to do business in New Hampshire.  The

principal office address is 1929 Allen Parkway, Houston, Texas 77019.  Mr. Blair primarily

worked out of the Concord, New Hampshire location, Bennett Funeral Home, located at 209

North Main Street, Concord, New Hampshire 03301.

**Jurisdiction and Venue**

3.      Mr. Blair's claims arise under Title VII.

4.      Upon information and belief, at all times relevant hereto, ECI has engaged in an

industry affecting commerce and has had more than 15 employees working each day in each of

20 or more calendar weeks in the current or preceding calendar year.

5.      This Court has jurisdiction of Mr. Blair's federal law claims pursuant to 28 U.S.C.

§ 1331, as this case involves questions of federal law.

6.     Venue is proper in, and ECI is subject to the personal jurisdiction of, this Court because Defendants maintain facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

7.     On or about February 1, 2019, Plaintiff filed a Charge of Discrimination with the New Hampshire Commission for Human Rights and the Equal Employment Opportunity Commission, in accordance with the requirements of 42 U.S.C. 2000(e) - 5(b) and (e).

8.     Plaintiff's Charge was filed with the New Hampshire Commission for Human Rights and the Equal Employment Opportunity Commission within 180 days after the unlawful employment acts were committed.

9.     After investigation, the New Hampshire Commission for Human Rights made a finding of probable cause on the issues of harassment and termination because of sexual orientation.

10.     On April 28, 2022, the Equal Employment Opportunity Commission issued Plaintiff a Notice of Right to Sue with respect to his charges of discrimination, thus satisfying the procedural prerequisites established by 42 U.S.C. 2000(e) - 5(b) and (3).  *See* <u>Exhibit A</u>, Notice of Right to Sue, attached hereto and incorporated herein by reference.

11.     This Complaint is filed fewer than 90 days after receipt of the Notice of Right to Sue, dated April 28, 2022 (as attached).

### Facts

12.     Matthew C. Blair identifies as a gay man.

13.     Mr. Blair was hired to work at ECI by Brian Coffta, General Manager, in August of 2016.

14.    Mr. Blair was assigned to work at ECI's Concord, NH location, known as Bennett Funeral Home, from August 2016 to January 2017.

15.    From January 2017 to January 2018, Mr. Blair was assigned to work at ECI's Manchester, NH location.

16.    From January 2018 until his termination, Mr. Blair was again assigned to work at ECI's Concord location, Bennett Funeral Home.

17.    Mr. Blair performed well throughout his employment with ECI.

18.    In or about the late summer or fall 2016, Mr. Coffta told staff at a staff meeting that people with an alternative lifestyle would not be tolerated in Concord, New Hampshire, as Bennett Funeral Home was the premier funeral home in the city.

19.    At the same time as the alternative lifestyle comment, Mr. Coffta explained to staff that they wanted to present a clean wholesome outlook to the community.

20.    At about the same time as the staff meeting described in ¶¶ 17-18, Chelsea Drew, Funeral Director, discussed moving an employee from the Nashua location to Bennett, the Concord location, but stated that the employee could not be moved because they could only have the right kind of people in Concord.  The employee who was being discussed was a lesbian woman.

21.    Employees at Bennett displayed animus against people of non-heterosexual sexual orientations.  For example:

    a.    Glen Henaire, Funeral Director, yelled at a florist who was gay.  Mr. Henaire's animus towards homosexual sexual orientations motivated his anger towards the florist.

b.      Mr. Henaire made a joke that all Catholic priests were gay, after a Catholic priest visited Bennett.

c.      Mr. Henaire would talk about, and make fun of, a member of the Episcopalian clergy, who was gay and had a partner.

d.      When a lesbian employee at another ECI location in Nashua would visit Bennett, Bennett employees would negatively comment about her sexual orientation and her appearance after she left.

22.     In or about mid-July 2018, Mr. Blair's coworkers somehow discovered his sexual orientation and began subjecting him to harassment.

23.     In or about mid-July 2018, Mr. Blair's colleagues, Chelsea Drew, Funeral Director, and Rebecca Beaulieu, Funeral Apprentice, began asking Mr. Blair inappropriate questions about male anatomy.  By way of example, they would ask him: "what do you think of his ass?" and "do you think that guy is cute?"

24.     At about the same time, Mr. Henaire told Mr. Blair that he did not want to do prep work with Mr. Blair anymore.  Prep work was performed in Bennett's basement.  Mr. Henaire told Mr. Blair that he did not want Mr. Blair "down there with him anymore."  Mr. Blair believes Mr. Henaire did not want to do prep work with him anymore because Mr. Henaire had learned of Mr. Blair's sexual orientation.

25.     On or about July 26, 2018, Ms. Drew and Ms. Beaulieu alleged that they became aware of allegations that Mr. Blair had made threats of physical violence.

26.     On July 29, 2018, Mr. Blair and Mr. Henaire traveled From Albany, NY to Constableville, NY for work.  Mr. Blair picked up Mr. Henaire at his girlfriend's apartment in the Albany, NY region on the way to Constableville, NY, and dropped Mr. Henaire off at the

same location on the way back from Constableville, NY. No other people were present in the car during the five-hour round trip between Albany, NY and Constableville, NY.

27.     On or about August 2, 2018, Mr. Coffta alleged to Alison Atwood, an employee in ECI's HR Department, that Mr. Blair made threats of physical violence against him and Mr. Henaire.

28.     Mr. Coffta's allegations were false.

29.     Mr. Coffta knew his allegations were false when he reported them to Ms. Atwood.

30.     As a result, Mr. Coffta's complaint, Ms. Atwood placed Mr. Blair on administrative leave on August 3, 2018.  Timothy "TJ" Smart, the acting District Manager who had replaced Mr. Coffta, told Mr. Blair that he was being placed on the administrative leave.

31.     Ms. Atwood conducted an investigation into the complaint on August 6 and 7, 2018.  She spoke with Brian Coffta, General Manager, Chelsea Drew, Funeral Director, Rebecca Beaulieu, Funeral Apprentice, Glen Henaire, Funeral Director, Colton Neely, Assistant (Ms. Drew's boyfriend's son), Lisa Whiteneck-Haines, Office Manager, and Matthew Blair, by phone.

32.     During the investigation, Mr. Coffta made statements about Mr. Blair, including that:

a.     He first heard that Mr. Blair made a verbal threat against him on July 31.

b.     Ms. Drew and Ms. Beaulieu told him that Mr. Blair made reference to shooting him and Mr. Henaire.

c.     On August 2, Ms. Drew and Ms. Beaulieu again spoke with Mr. Coffta because they had both heard Mr. Blair state that he wanted to bring a gun into work and keep it in his desk.

d.     Mr. Coffta was concerned for the associates in the office, and he reported the incident to Alison Atwood in HR.

e.     Mr. Coffta had witnessed Mr. Blair having outbursts in the past, as well as acting oddly by disappearing for hours at a time.

f.     Mr. Blair has yelled and screamed at others and demonstrated a short temper.

33.    The statements in ¶31a-f are false.

34.    Mr. Coffta knew the statements were false when he reported them to Ms. Atwood.

35.    Ms. Atwood did not properly investigate and/or follow up on Mr. Coffta's statements.

36.    During the investigation, Ms. Drew made statements about Mr. Blair, including that:

a.     Ms. Drew was told by Mr. Neely (her boyfriend's son) that Mr. Blair had said that he wanted to blow Mr. Henaire's brains out, and that, after being told not to talk that way by a crematory operator, Mr. Blair agreed and changed his comment to shooting Mr. Henaire in the kneecaps.

b.     On July 25, 2018, Ms. Beaulieu heard Mr. Blair say that he wanted to blow Mr. Coffta's head off.

c.     Ms. Drew had seen Mr. Blair rip apart a table and break it into pieces.

d.     On August 2, Ms. Drew heard Mr. Blair say that he wanted to bring a gun into work.

e.     Mr. Blair would give Mr. Henaire the finger behind his back and stirred the pot.

6

f.      Specialized bulbs were missing and then broken glass was found in the prep room.  Mr. Henaire cleaned up the glass and ordered new bulbs.  They never arrived.  Mr. Blair told everyone that Mr. Henaire probably took the bulbs.  They were later found hidden In Mr. Blair's desk.

g.      Ms. Drew has also heard Mr. Blair yell at families over the phone because he would get irritated.

37.     The statements in ¶35a-g are false.

38.     Ms. Drew knew the statements were false when she reported them to Ms. Atwood.

39.     Ms. Atwood did not properly investigate and/or follow up on Ms. Drew's statements.

40.     During the investigation, Ms. Beaulieu made statements about Mr. Blair, including that:

a.      Mr. Blair would turn off lights or hand flowers to families early.

b.      Ms. Beaulieu had heard that Mr. Blair was unpredictable. She witnessed him breaking the table. She had heard that Mr. Blair had blowups in the past.

c.      Ms. Beaulieu had witnessed Mr. Blair mock Mr. Henaire and give him the finger.

d.      On July 25, Ms. Beaulieu and Mr. Blair were in the prep room and Mr. Blair said that he had no choice but to shoot Mr. Coffta or just kill him.

e.      On Saturday, August 4, Mr. Coffta went through Mr. Blair's desk and found a flip book that Mr. Blair drew and it was entitled "For Rebecca."  Ms. Atwood recorded

7

Ms. Beaulieu's description of the book as follows: "On the first page, there was a stick figure, sad, lonely, then picture of cat, happy, then stick figure was dead and the cat killed her."

41.    The statements in ¶39a-e are false.

42.    Ms. Beaulieu knew the statements were false when she reported them to Ms. Atwood.

43.    Ms. Atwood did not properly investigate and/or follow up on Ms. Beaulieu's statements.

44.    During the investigation, Mr. Henaire made statements about Mr. Blair, including that:

a.    Mr. Blair has thrown violent fits and cursed at him to the point that Mr. Heanire was scared for his safely.

b.    Mr. Blair made obscene hand gestures behind Mr. Henaire's back.

c.    Mr. Blair created a very uncomfortable work environment; he would fly off the handle.

d.    Mr. Henaire witnessed Mr. Blair getting into an argument with a family to the point that Ms. Beaulieu had to calm Mr. Blair down.

e.    Mr. Blair also exhibited strange, erratic behavior and had a violent temper.

45.    The statements in ¶43a-e are false.

46.    Mr. Henaire knew the statements were false when he reported them to Ms. Atwood.

47.    Ms. Atwood did not properly investigate and/or follow up on Mr. Henaire's statements.

8

48.   During the investigation, Mr. Neely made statements about Mr. Blair, including that:

a.   Mr. Blair talked throughout the day that they were together about how he doesn't like Mr. Henaire because he was bossy and showed no respect.

b.   Mr. Blair referred to Mr. Henaire as a "piece of shit" and an "asshole."

c.   Mr. Neely heard Mr. Blair say that Mr. Henaire needs to be shot in the head when they were together at the crematory.  Mr. Blair then stated that he would shoot Mr. Henaire in the kneecaps.

d.   Mr. Blair stated that he wanted to put fertilizer in a shake and feed it to Mr. Henaire.

49.   The statements in ¶47a-d are false.

50.   Mr. Neely knew the statements were false when he reported them to Ms. Atwood.

51.   During the investigation, Lisa Whiteneck-Haines, Office Manager, stated that:

a.   Ms. Whiteneck-Haines never saw anything violent or heard anything concerning coming from Mr. Blair.

b.   Ms. Whiteneck-Haines can only recall one conversation they had about guns and it was about the Second Amendment.  Mr. Blair supported it, but he wasn't a gun lover.

c.   Regarding the table incident, Mr. Blair was removing a broken leg from the table.  He then dismantled it for ease of dumping.

d.   Ms. Whiteneck-Haines never witnessed Mr. Blair yell at or get irritated with a family.

e.   Mr. Henaire was not a good teacher and did not train Mr. Blair properly.

f.   Mr. Henaire is hard to read and has gotten worse as time went on.

9

52.     The statements in ¶50a-f are true.

53.     Ms. Atwood did not properly investigate and/or follow up on Ms. Whiteneck-Haines's statements.

54.     During the investigation, Mr. Blair stated that:

a.      Mr. Blair thought Ms. Drew said "get a gun" related to the comment that someone was going to shoot Mr. Henaire.

b.      Mr. Blair denied making comments about shooting Mr. Henaire in the head or kneecap.

c.      Ms. Beaulieu was trying to move a table upstairs, and in the course of doing this a leg was broken.  Mr. Blair removed the broken leg to prevent anyone from being injured by the broken leg.  Mr. Blair denied smashing the table in anger.

d.      Mr. Blair denied behaving badly towards Mr. Henaire behind his back.

e.      Mr. Blair and Mr. Henaire spent five hours in the car on July 29th, without incident, on a work-related trip to New York.

55.     The statements in ¶53a-e are true.

56.     Ms. Atwood did not properly investigate and/or follow up on Mr. Blair's statements.

57.     Mr. Henaire told Ms. Atwood that he would not work with Mr. Blair again.

58.     The real reason Mr. Henaire would not work with Mr. Blair is because of Mr. Blair's sexual orientation.

59.     Mr. Coffta, Ms. Drew, Ms. Beaulieu, Mr. Henaire, and Mr. Neely made false statements about Mr. Blair to Ms. Atwood because of Mr. Blair's sexual orientation.

10

60.     Ms. Atwood concluded that "[b]ased on the information learned from the interviews, it was clear that Mr. Blair violated the Company's policy that prohibits violence in the workplace."

61.     On August 6, 2018, Mr. Henaire sent a letter to the New Hampshire State Board of Registration of Funeral Director and Embalmers, stating:

   a.     That Mr. Blair had been placed on an indefinite administrative leave.

   b.     A request that the Board terminate Mr. Henaire's sponsorship of Mr. Blair effective immediately.

62.     Mr. Henaire requested to be removed as Mr. Blair's sponsor because of Mr. Blair's sexual orientation.

63.     Based on the findings of Ms. Atwood's investigation, Mr. Blair was terminated on August 8, 2018.

64.     Mr. Blair was terminated by phone by T.J. Smart.  The people on the call were Mr. Smart and Mr. Blair.

65.     Because of Mr. Henaire's request to be removed as Mr. Blair's sponsor and Mr. Blair's termination from Bennett, Mr. Blair was unable to complete the requirements to obtain a Funeral Director license.

66.      Mr. Coffta reported to the New Hampshire Commission for Human Rights that he had reported the alleged threats by Mr. Blair to the Concord, NH Police Department and the Sanford, ME Police Department.

67.     Mr. Blair was never contacted by either police department regarding these alleged reports.

68.     The Concord, NH Police Department has no record of any report about Mr. Blair.

69. The Sanford, ME Police Department has no record of any report about Mr. Blair.

70. With respect to the reports to the police, the New Hampshire Commission for Human Rights investigator found that "There is no evidence that Respondent filed a complaint or notified the police about the alleged threats.  Given the severity and nature of the alleged threats, the lack of action on Respondent's part casts doubt on the credibility of the allegations."

71. Mr. Blair's termination was a pretext for sexual orientation discrimination.

72. Mr. Blair has, and continues to, suffer damages, including, but not limited to, lost wages, lost earning capacity, lost employment benefits, emotional distress, humiliation, inconvenience, and loss of enjoyment of life.

73. Mr. Blair seeks all damages to which he is entitled.

**COUNT I**
**Sex and Sexual Orientation Discrimination in Violation of Title VII**

74. Mr. Blair re-alleges and incorporates herein by reference, all of the allegations contained in the preceding paragraphs.

75. As described in this Complaint, the Defendant discriminated against the Plaintiff because of his sex and sexual orientation in violation of Title VII, 42 U.S.C. §2000(e) *et seq*., in unlawfully terminating his employment.

76. The Defendant's actions were in willful, gross and/or reckless disregard of the Plaintiff's rights under 42 U.S.C. §2000(e).

77. As a direct and proximate result of the Defendant's violation of the Plaintiff's rights secured by 42 USC §2000(e) *et seq*., as herein above stated, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, pain and suffering, loss of enjoyment of life, punitive damages, and attorneys' fees and costs.

**COUNT II**
**Sex and Sexual Orientation-Based Hostile Environment in Violation of Title VII**

78.     Mr. Blair re-alleges and incorporates herein by reference, all of the allegations contained in the preceding paragraphs.

79.     As described throughout Mr. Blair's Complaint, he was subjected to repeated offensive comments regarding his sex and sexual orientation and conduct based upon his sex and sexual orientation.

80.     The repeated offensive comments and conduct were based on Mr. Blair's sex and sexual orientation.

81.     The repeated offensive comments and conduct regarding Mr. Blair's sex and sexual orientation, including employees at Bennett making false statements about Mr. Blair to HR, were so severe and/or pervasive that they created an offensive and demeaning work environment for Mr. Blair and interfered with his ability to perform his job.

82.     Mr. Blair did not welcome, encourage, or consent to the sex and sexual orientation-based harassment to which he was subjected as an employee of the Defendants.

83.     The sex and sexual orientation-based harassment to which Mr. Blair was subjected as an employee of the Defendants has had, and continues to have, a detrimental effect upon his employment and personal well-being.

84.     Defendants willfully violated Title VII, 42 U.S.C. §2000(e) *et seq.*, by subjecting Mr. Blair to a sex and sexual orientation-based hostile environment during his employment with the Defendants as described in this Complaint.

85.     As a direct and proximate result of the Defendants' violation of the Plaintiff's rights secured under 42 U.S.C. §2000(e) *et seq.*, as stated herein, the Mr. Blair has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, punitive damages, and attorneys' fees and costs.

Respectfully submitted,

MATTHEW C. BLAIR, Plaintiff

By His Attorneys
UPTON & HATFIELD, LLP

Date:  July 20, 2022                    By: /s/ Brooke Lovett Shilo
                                        Brooke Lovett Shilo (NHBA #20794)
                                        Heather M. Burns (NHBA # 8799)
                                        10 Centre Street, PO Box 1090
                                        Concord, NH  03302-1090
                                        (603) 224-7791
                                        bshilo@uptonhatfield.com